IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTHCAROLINA

| | | |
|---|---|---|
| TYSON HILDEBRANDT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25cv358 |
| | ) | |
| WAL-MART STORES EAST, LP, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

This employment case is before the court on the motion for summary judgment by Defendant Wal-Mart Stores East, LP ("Walmart"). (Doc. 57.) Plaintiff Tyson Hildebrandt, who proceeds pro se, filed a response in opposition (Doc. 60), and Walmart has replied (Doc. 61). The motion is fully briefed and ready for decision. For the reasons that follow, Walmart's motion for summary judgment will be granted.

# I. BACKGROUND

## A. Factual Background

Construed in the light most favorable to Hildebrandt as the non-moving party, the factual record shows the following:

Hildebrandt, an African-American male, began working for Walmart on April 20, 2024 as a maintenance associate. (Doc. 58-2 at 89-90; Doc. 58-3 ¶ 5.) The maintenance associate job duties include cleaning "all areas of the facility both inside and

outside" and performing "routine maintenance on machines and other equipment in accordance with company policies and procedures." (Doc. 58-3 at 6.) Hildebrandt worked on the second shift, which was from 4:00 p.m. to 11:00 p.m. (Doc. 58-2 at 4-6.) The second shift has about an "hour of overlap" with the third shift, which starts at 10:00 p.m. (Id. at 5-6.)

On May 6th, Hildebrandt was in the break room taking a 15-minute break. (Id. at 2-3.) George Leonard, a Caucasian male who was a team lead for the third shift (Doc. 58-3 ¶ 6), came into the break room "being all aggressive" and asked Hildebrandt, "[w]hat are you doing?" (Doc. 58-2 at 3-4.) Hildebrandt responded that he was taking his break, but Leonard told him that he "need[ed] to get back out on [the] floor." (Id. at 3.) Leonard apologized to Hildebrandt the next night. (Id. at 9.)

Two weeks later, Hildebrandt was again in the break room. (Id. at 25, 105.) Leonard asked Hildebrandt, "how much time you got left on your break?" (Id. at 25.) Hildebrandt showed Leonard a timer on his phone that he set to indicate when his break ended. (Id.) Leonard then walked away. (Id.)

Next, near the end of May 2024, Leonard made comments to Hildebrandt about cleaning up trash. (Id. at 26.) Hildebrandt contends that Leonard was "picking at [him], trying to get some stuff started, knowing . . . [Hildebrandt] finished [his] job." (Id.) Leonard thought Hildebrandt had not cleaned up the part of

the store he was supposed to, while Hildebrandt contends that he "100 percent . . . had picked up the trash." (Id. at 26-27.)

A few weeks later in June, Leonard asked Hildebrandt to dust-mop a clothing area. (Id. at 10, 105.) Hildebrandt was not able to find a dust-mop and told Leonard, who replied: "are you stupid or dumb? You don't know what a dust mop looks like?" (Id. at 10-11.)

Tensions between Leonard and Hildebrandt came to a head a few days later on June 18th. (Id. at 105.) Leonard was "showing a new employee that got hired around." (Id. at 33.) Hildebrandt and a few other employees decided to "help [Leonard and the new employee] close the front door because . . . something was wrong with it." (Id.) Leonard then stated, presumably to Hildebrandt, "what are you doing?" (Id.) Hildebrandt replied, "I'm clocking out and getting ready to go the hell home. What do you think?" (Id. at 35.) Hildebrandt was not reprimanded for his use of profanity. (Id.)

On June 24th, Hildebrandt filed a charge with the Equal Employment Opportunity Commission ("EEOC"), based on the aforementioned incidents. (Id. at 35; see also Doc. 58-4 at 1.) The charge listed discrimination based on race, retaliation, and harassment. (Doc. 58-4 at 1.) In the description, Hildebrandt wrote, in full, that "[t]he reason why I am targeted is because [I] took a 15 minute break and 3rd shift guy." (Id.) Hildebrandt

stated that he did not tell anyone at Walmart that he filed the charge. (Doc. 58-2 at 36 ("I didn't tell nobody nothing.").)

Four days later, Hildebrant had a meeting with Parker York and Anna Store, who were "Second Shift Team Leads" for Walmart (Doc. 58-3 at 2 ¶ 6; Doc. 58-2 at 41.)[1] The meeting was called to discuss Hildebrandt's performance at work. (Doc. 58-2 at 42, 44.) York and Store expressed concerns about Hildebrandt's work performance, which Hildebrandt characterized as his supervisors "trying to say that I wasn't doing my job when I know I was." (Id. at 42.) Hildebrandt also told York and Store about his run-ins with Leonard, including the June 18 dust-mop incident. (Id. at 41, 44.)

On either June 29 or 30, Hildebrandt had a conversation with a fellow employee named Roderick. (Id. at 46-47, 105.) Roderick is also an African-American male, but Leonard did not harass Roderick. (Id. at 13, 19, 28.) Leonard asked Roderick if Hildebrandt was doing his work. (Id. at 46-47.) Hildebrandt interpreted this as Leonard "hav[ing] others monitor [his] work." (Id. at 105.)

Next, on July 16, Hildebrandt learned from an unnamed coworker that Henry Murden, an African-American "Front-End Coach[]," (Doc.

---

[1] Hildebrandt testified at his deposition that Parker "was the third-shift manager," (Doc. 58-2 at 43), while Walmart states that Parker was a "Second Shift Team Lead[]." (Doc. 58-3 at 2 ¶ 6.)

58-3 at 2 ¶ 6), criticized him for taking too long on a project (Doc. 58-2 at 52-53). Further, Hildebrandt learned that an employee named Christy made a complaint alleging that Hildebrandt did not announce his presence before entering the women's bathroom to clean. (Id. at 53-54.) Hildebrandt denies both taking too long to clean and not announcing his presence before entering the women's bathroom. (Id.) Rather, Hildebrandt believes that Christy and Murden were targeting him because of his EEOC complaint. (Id. at 54-55.)

Next, on July 20, manager Marcus Suggs, an African-American male, and "Second Shift Team Lead[]" Brandi Burnley, a Caucasian female, called Hildebrandt into a meeting to discuss his performance. (Id. at 56; Doc. 58-3 at 2 ¶ 6.) According to Hildebrandt, Suggs and Burnley "unfairly accused [Hildebrant] of taking too long to finish tasks." (Doc. 58-2 at 56.) Hildebrandt received a write-up and a "yellow" disciplinary action. (Id. at 56, 113.)[2] The write-up notes that Burnley asked Hildebrandt to perform certain tasks and report back to her. (Id. at 113.)

[2] A yellow disciplinary action is given out for infractions which have a "slight impact on associates and/or service to the customer," "[c]ause[] minimal impact on operations or strategy," "[d]o[] not meet performance and/or conduct expectations," or "[a]ny conduct that violates a company policy or guideline." (Doc. 58-3 at 10.) Yellow disciplinary actions are given out if: (1) the "manager has already had a verbal conversation with [the employee] about a specific performance and/or conduct issue, and steps have not been taken to remedy it," or (2) the manager "has determined the circumstances with [the employee's] conduct warrant this level of accountability." (Id.)

However, Hildebrandt took longer than desired to report back, and "only completed one task through[out] the night." (Id.) Burnley stated that when Hildebrandt "does not do the job the right way[,] it falls on other employees to complete [his tasks]." (Id.)

The next major incident occurred on August 3. (Id. at 67.) Leonard took exception to the method Hildebrandt used to load and carry trash bags. (Id. at 68-69.) Hildebrandt told Leonard to "[b]ack off, leave me alone. Don't tell me how to do my job . . . [y]ou're not my f'ing boss." (Id. at 69-70.) Further, Hildebrandt told Leonard to "leave me the f[*]ck alone." (Id. at 71.) Hildebrandt was not written up for this incident. (Id.)

On August 14, Hildebrandt called Walmart Global Ethics to file a complaint. (Id. at 78.) Hildebrandt told Global Ethics that "he felt like he is being racially profiled, because he is black, and George is white." (Doc. 58-3 at 17.) Hildebrandt further explained that he felt like the managers were "targeting and attacking him" and that employees on the third shift were "finding reason[s] to fire him." (Id.)

On September 1, Hildebrant had a meeting with Suggs and "Front-End Coach[]" Keosha Clapp, an African-American female. (Id. at 81; Doc. 58-3 at 2 ¶ 6.) In the meeting, Hildebrandt "admitted some mistakes," including that he broke "the baler that

bales cardboard." (Doc. 58-2 at 81.)[3] Hildebrandt also expressed interest in moving to another department within Walmart, to which Suggs was willing to consider. (Id. at 82.)

Hildebrandt ultimately received an "orange" disciplinary action in the meeting.[4] (Id. at 83.) Clapp wrote that Hildebrandt "is tasked out daily from a frontend team lead. On [July 31] he was tasked out to the restrooms, breakroom and the mother[']s room. The restrooms did not get cleaned until 10pm when his peer maintenance associate cleaned them." (Doc. 58-3 at 14.) Clapp explained that because Hildebrandt did not complete his task, his peer associate was not able to complete his own tasks because he had to cover for Hildebrand. (Id.) Hildebrandt refused to sign the disciplinary assessment, writing "I DISAGREE WITH THIS AND WILL NOT SIGN THIS." (Id.) Hildebrandt explained that he thought the disciplinary assessment was "full of crap." (Doc. 58-2 at 83.)

The parties dispute whether Hildebrandt resigned on September 4 or 9. (Compare id. at 78 with Doc. 58-3 at 3 ¶ 13.) In either

[3] Operating the baler was within the scope of Hildebrandt's job duties. (Id. at 60.)

[4] An "orange" disciplinary action is given out for conduct which, inter alia, has a "moderate impact on associates and/or service to the customer." (Doc. 58-3 at 10 (emphasis removed).) An Orange disciplinary action may be given out if the employee "already ha[s] an active" yellow disciplinary action. (See id.) Employees "may only receive one of each level of disciplinary action in any 12-month period," so if the employee has already received a yellow disciplinary action, he will receive an orange disciplinary action for the next infraction. (Id. at 9.)

case, Hildebrandt voluntarily resigned from his job at Walmart. (See Doc. 58-2 at 103 ("I came to work, handed them my thing, my jersey or whatever you want to call it, and told them I was done"); Doc. 58-3 at 3 ¶ 13). Hildebrandt stated that he quit on the advice of his doctor, who told him that the job had been causing him too much stress. (Doc. 58-2 at 78-79.)

**B. Procedural Background**

On May 7, 2025, Hildebrandt filed this action, bringing claims for discrimination and retaliation under Title VII, wrongful discharge in violation of North Carolina public policy, and for violation of the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143.422.1 et seq. (Doc. 1 ¶¶ 61-77.) On Walmart's motion, the court dismissed Hildebrandt's claims for wrongful discharge in violation of North Carolina public policy, his claim under the North Carolina Equal Employment Practices Act, and his Title VII retaliation claim to the extent it was based on an alleged threat to transfer Hildebrandt to another department which never materialized. (Doc. 28.)

Walmart now moves for summary judgment on Hildebrandt's remaining claims. (Doc. 57.) The motion is fully briefed and ready for decision.

**II. ANALYSIS**

**A. Legal Standards**

Summary judgment is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Basnight v. Diamond Devs., Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the "court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Guessford v. Pa. Nat'l Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994)). While the movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate the existence of a genuine dispute of material fact. Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). A mere scintilla of evidence is insufficient to avoid summary judgment. Anderson, 477 U.S. at 252; Dash v. Mayweather, 731 F.3d

303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." (citing Anderson, 477 U.S. at 252)); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent factually unsupported claims and defenses from proceeding to trial" (citation and internal quotation marks omitted)). Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248 49. Trial is unnecessary only if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).

Federal Rule of Civil Procedure 56(c) provides procedures governing a plaintiff's response to a motion for summary judgment. In short, "Rule 56(c)(1) makes clear that parties are obligated to support their assertions with citations to the record and that the record evidence submitted to support a party's position must be comprised of admissible evidence." Reid v. Charlotte-Mecklenburg Bd. of Educ., No. 314CV00066FDWDSC, 2016 WL 6080545, at *2 (W.D.N.C. Feb. 12, 2016) (emphasis in original), aff'd sub nom. Reid v. Charlotte Mecklenburg Schs., 675 F. App'x 315 (4th Cir. 2017). Though pro se plaintiffs may still benefit from the liberal

construction of pro se pleadings, see Sinclair v. Mobile 360, Inc., 417 F. App'x 235, 243 (4th Cir. 2011) (applying liberal construction for pro se parties to consideration of evidence under a prior version of Rule 56), "a pro se plaintiff must comply with Rule 56 of the Federal Rules of Civil Procedure and come forward with sufficient evidence upon which a reasonable jury could return a verdict in his favor," Reid, 2016 WL 6080545, at *4.

**B. Title VII Discrimination**

Walmart contends that summary judgment is warranted on Hildebrandt's discrimination claim because Hildebrandt cannot meet his prima facie burden under the McDonnell Douglas[5] burden shifting framework. (Doc. 58 at 12.) It offers three separate reasons for summary judgment. First, Walmart argues that Hildebrandt "cannot show that he was performing his job duties satisfactorily." (Id. at 13.) Second, it contends that he did not suffer an adverse employment action because he was not discharged or constructively discharged. (Id. at 16-17.) Third, it asserts that he is unable "to establish that he was treated differently than similarly situated employees outside of his protected class." (Id. at 19.) Hildebrandt counters that he is able to establish a prima facie case of race discrimination under McDonnell Douglas because there are disputes of fact "regarding [his] performance, the adverse

[5] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

action of constructive discharge, and whether the circumstances give rise to an inference of discrimination based on the pattern of treatment by Leonard." (Doc. 60 at 4.)

Title VII makes it unlawful "for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). Courts apply the McDonnell Douglas framework to race discrimination claims under Title VII. See, e.g., Paris v. Arc/Davidson Cnty., Inc., 307 F. Supp. 2d 743, 754 (M.D.N.C. 2004). In order to make a prima facie case under that framework, a plaintiff must show "(1) his membership in a protected class; (2) his satisfactory job performance; (3) an adverse employment action; and (4) similarly situated employees outside the protected class who received more favorable treatment." Tabb v. Bd. of Educ. of Durham Pub. Schs., 29 F.4th 148, 157 (4th Cir. 2022).

Here, "[a]s an African-American, [Hildebrandt] is clearly a member of a protected class and thus satisfies the first prong of the test." Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994). The court further assumes without deciding that Hildebrandt's testimony creates a genuine dispute of material fact about whether he was performing his job satisfactorily.

As for an adverse employment action, Hildebrandt acknowledges

that he is relying on a theory of constructive discharge. (Doc. 60 at 4.) A constructive discharge occurs when "an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Green v. Brennan, 578 U.S. 547, 555 (2016) (quoting Pa. State Police v. Suders, 542 U.S. 129, 141 (2004)). If the employee resigns under these conditions, "Title VII treats that resignation as tantamount to an actual discharge." Id. The purpose of the constructive discharge doctrine is to "protect[] an employee 'from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers.'" Carter, 33 F.3d at 459 (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985), cert. denied, 475 U.S. 1082 (1986)).

However, "difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019). The Fourth Circuit has held that "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Carter, 33 F.3d at 459. The Fourth Circuit recently observed that "being yelled at and told you are a poor manager and chastised in front of customers

[does] not create conditions so intolerable as to compel a reasonable person to resign." Evans, 936 F.3d at 193 (citing Williams v. Giant Food, Inc., 370 F.3d 423, 434 (4th Cir. 2004)). Further, "ostracization and required counseling for turning in an inaccurate time card [does] not make the workplace intolerable." Id. (citing Matavia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 273 (4th Cir. 2001)). Even "being ignored by co-workers and top management [is] insufficient to establish constructive discharge." Id. (citing Munday v. Waste Mgmt. of N. Am., 126 F.3d 239, 244 (4th Cir. 1997)). Finally, "being unfairly criticized, losing supervisory responsibilities, and having one's supervisor display a poster that may have been offensive to African Americans [is] insufficient to establish constructive discharge." Id. (citing Carter, 33 F.3d at 459-60).

On this record, no reasonable jury could conclude that Hildebrandt was constructively discharged. Viewed in the light most favorable to Hildebrandt, the evidence demonstrates that he had multiple clashes with Leonard, who unfairly questioned his work and use of break time. (See Doc. 58-2 at 2-3, 10, 25, 26-27.)[6] Further, Hildebrandt's work was unfairly criticized by management. (See, e.g., id. at 42, 44, 52-56.) However, this is

[6] As stated above, the court assumes arguendo that Hildebrandt's deposition testimony creates a genuine issue of material fact regarding whether he was satisfactorily performing his job.

insufficient to show constructive discharge. As in Carter, the fact that Hildebrandt was criticized unfairly by his supervisors is insufficient to rise to the level of constructive discharge. See 33 F.3d at 459-60. Further, Leonard's conduct toward Hildebrandt, although unpleasant, does not rise to the level of constructive discharge. Similar to Williams, where the plaintiff's supervisors "yelled at her, . . . gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back," these interactions do not rise to the level of constructive discharge. See 370 F.3d at 434. For this reason alone, Hildebrandt fails to meet his prima facie burden. See id.

Further, Hildebrandt has not produced evidence that "he was treated differently than other similarly situated employees outside his protected class." Giles v. Nat'l R.R. Passenger Corp., 59 F.4th 696, 704 (4th Cir. 2023) (citing Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd sub nom. Coleman v. Ct. of Appeals of Md., 566 U.S. 30 (2012)). "To do so, [Hildebrandt] must present a similarly situated comparator who received more favorable treatment." Id. (citing Coleman, 626 F.3d at 191).

The only similarly situated employee who is discussed in the record is Roderick, an African-American male who is within Hildebrandt's protected class. (Doc. 58-2 at 13, 19.)

Additionally, Leonard did not harass Roderick, nor did any other employee at Walmart. (See, e.g., id. at 19 ("I had another black guy named Rod that was a coworker that was outside of me, [Leonard] didn't harass Rod," "[Leonard] did not harass Rod. He harassed me . . . [n]ot Rod.").) As a result, Hildebrandt's "assertion of disparate treatment based on race 'does not rise above speculation.'" Giles, 59 F.4th at 705 (quoting Coleman, 626 F.3d at 191) (alterations adopted).

Therefore, the court grants Walmart's motion for summary judgment on Hildebrant's Title VII discrimination claim.

### C. Title VII Retaliation

Walmart contends that summary judgment is warranted on Hildebrandt's retaliation claim for two reasons. First, Walmart argues that Hildebrandt did not suffer an adverse employment action. (Doc. 58 at 20.) Second, it asserts that even if Hildebrandt suffered an adverse employment action, there is no evidence of a causal connection between protected activity and the adverse employment action. (Id. at 21.)

Hildebrandt counters that he was constructively discharged. (Doc. 60 at 4.) He contends that a reasonable jury could find that his working conditions had become so intolerable that a reasonable person would feel compelled to resign. (Id.) As for a causal connection, Hildebrandt points to temporal proximity, "together with the EEOC Charge and earlier internal complaints,"

as "sufficient to create a genuine dispute on causation." (Id.)

"A plaintiff may prove a Title VII retaliation claim either through direct evidence of retaliatory animus or via the application of the McDonnell Douglas burden-shifting framework." Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021). Here, Hildebrandt proceeds under the McDonnell Douglas framework. Under that framework, "[i]n order to establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that [he] engaged in a protected activity; (2) that [his] employer took an adverse employment action against [him]; and (3) that there was a causal link between the two events." EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005).

For the same reasons stated above, no reasonable jury could conclude that Hildebrandt was constructively discharged, meaning that an adverse employment action was not taken against him. Accordingly, he does not meet the second element of his prima facie burden. Additionally, even if Hildebrandt had been constructively discharged, he fails to demonstrate a causal link between his EEOC charge and his discharge.

"[T]o establish the necessary causation for a retaliation claim, 'the employer must have taken the adverse employment action because the plaintiff engaged in a protected activity.'" Perkins v. Int'l Paper Co., 936 F.3d 196, 214 (4th Cir. 2019) (quoting Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir.

1988)) (emphasis omitted). The Fourth Circuit has "consistently required proof of a decisionmaker's knowledge of protected activity to support a Title VII retaliation claim." Roberts, 998 F.3d at 124. "To establish a causal relationship between the protected activity and the termination, a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." Id. This "requires 'more evidence than mere curious timing coupled with speculative theories' about 'discussions between a decisionmaker and someone with knowledge of the plaintiff's protected activity' that 'create only a speculative inference regarding the decisionmaker's awareness.'" Id. at 126 (quoting EEOC v. EmCare, Inc., 857 F.3d 678, 683 (5th Cir. 2017)) (alterations adopted).

Here, Hildebrandt has not presented any evidence, beyond his own "speculative theories," Emcare, 857 F.3d at 683, that any Walmart employee at his store had actual knowledge of his EEOC complaint. Hildebrandt states that he did not tell anyone at Walmart that he filed the EEOC charge and that "[n]obody knew anything" about it. (Doc. 58-2 at 36.) Indeed, Hildebrandt states that "[n]o manager ever came up to [him] and told [him]" that he knew about the charge. (Id. at 76.) Even Hildebrandt's own speculation about actual knowledge is unsure of itself: in his deposition, Hildebrandt stated, "I don't know if they did or didn't" get "the EEOC [charge] filed at the store," concluding

that "they probably did." (Id. at 66.) In sum, there is no evidence in the record, beyond "speculative theories," that would rise above a "speculative inference regarding the decisionmaker's awareness." EmCare, 857 F.3d at 683.

Hildebrandt's reliance on temporal proximity between his complaint and discharge fares no better. While "[t]emporal proximity between protected activity and the adverse employment action can be 'highly suspicious' and 'give rise to a strong inference of . . . discrimination,' . . . temporal proximity alone is insufficient to establish the third element of causation[.]" Smith v. Strayer Univ. Corp., 79 F. Supp. 3d 591, 605 (E.D. Va. 2015) (quoting Weth v. O'Leary, 796 F. Supp. 2d 766, 782 (E.D. Va. 2011)) (alterations adopted). "Generally speaking, . . . the passage of time alone cannot provide proof of causation unless the 'temporal proximity between an employer's knowledge of protected activity and an adverse employment action' was 'very close.'" Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229, 233 (4th Cir. 2006) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam)).[7]

"The Fourth Circuit has not set forth a specific timeframe for what constitutes 'very close.'" Bowman v. Balt. City Bd. of

[7] Unpublished opinions of the Fourth Circuit are not precedential but can be cited for their persuasive, but not controlling, authority. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

Sch. Comm'rs, 173 F. Supp. 3d 242, 250 (D. Md. 2016). It has found that approximately three to four months is too long to establish temporal proximity. See, e.g., Pascual, 193 Fed. App'x at 233 (concluding that "at least three to four months" between termination of employment and protected activity is "too long to establish a causal connection by temporal proximity alone"); Roberts, 998 F.3d at 127 (concluding that a three-month gap between protected activity and termination was insufficient to find temporal proximity, "particularly in the absence of any concrete, nonspeculative evidence" of actual knowledge). On the other hand, the Fourth Circuit has found that a gap of a month between protected activity and termination, at the summary judgment stage, is "sufficient to create a jury question regarding the causation prong of the prima facie [retaliation] case." Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 253 (4th Cir. 2015).

Here, Hildebrandt filed his EEOC charge on June 24th. (Doc. 58-2 at 35; Doc. 58-4 at 1.)[8] He resigned about two and a half months after he filed the EEOC charge, on either September 4 or 9. (Doc. 58-2 at 78; Doc. 58-3 at 3 ¶ 13.)

On this record, "particularly in the absence of any concrete,

---

[8] Hildebrandt also filed a complaint with Walmart Global Ethics on August 14th (Doc. 58-2 at 78); however, Walmart has produced uncontroverted evidence that no one in the store had knowledge of the Global Ethics complaint until after Hildebrandt's resignation. (See Doc. 58-4 at 6 (showing that Walmart store representative was not emailed about the Global Ethics complaint, and did not view Global Ethics complaint, until September 10th).)

nonspeculative evidence that [Hildebrandt's supervisors] had any knowledge of the harassment [and discrimination] allegations," the gap between Hildebrandt's EEOC charge and his resignation "does not present a circumstance that courts have characterized as creating a strong inference of retaliation." Roberts, 998 F.3d at 127. Therefore, the court concludes that no reasonable jury could find a causal link between Hildebrandt's EEOC charge and his alleged constructive discharge, where no evidence has been produced that any of Hildebrant's supervisors knew about his complaint.[9] Accordingly, Walmart's motion for summary judgment on Hildebrandt's Title VII retaliation claim will be granted.

**III. CONCLUSION**

For the reasons stated,

---

[9] To the extent Hildebrandt relies on his internal complaints about Leonard in establishing temporal proximity, York and Store called a meeting to discuss Hildebrandt's performance at work before Hildebrant told them about his run-ins with Leonard. (See Doc. 58-2 at 41-44.) "Retaliatory conduct, by its very nature, must come after the protected activity." Hall v. Greystar Mgmt. Servs., L.P., 637 F. App'x 93, 98 (4th Cir. 2016) (citing Dowe, 145 F.3d at 657) (emphasis in original); see also Wilcox v. Lyons, 970 F.3d 452, 460 (4th Cir. 2020) ("The very premise of a retaliation claim is that the employer has subjected an employee to adverse consequences in response to [his] claim of discrimination.") (emphasis added); Durkin v. City of Chicago, 341 F.3d 606, 614-15 (7th Cir. 2003) ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against [him] for engaging in statutorily protected activity."). Because Hildebrandt's supervisors began having concerns about his performance before he alerted them to his difficulties with Leonard, it is not plausible that Hildebrandt's supervisors began retaliating against him with unfair criticisms of his work product because of his internal complaints about Leonard.

IT IS ORDERED that Walmart’s motion for summary judgment (Doc. 57) is GRANTED, and Hildebrandt’s complaint (Doc. 1) is DISMISSED WITH PREJUDICE.

/s/ Thomas D. Schroeder
United States District Judge

November 23, 2026